## MARY L. NARBONNE v. GEORGE C. STORER.[1]

May 29, 1913.

Nos. 17,977—(80).

**Landlord and tenant — damage from water — evidence.**

In this action to recover damages to property of plaintiff, a tenant of defendant, caused by the flooding of the leased premises with water which came from the ceiling, it is *held:*

(1) The rule of res ipsa loquitur has no application.

(2) The evidence was insufficient to sustain the verdict that the water came from a leak in certain water pipes under the control of the defendant.

(3) The evidence was also insufficient to sustain a finding that defendant was negligent, even conceding that the damage was caused by a leak in such pipes.

[1] Reported in 141 N. W. 835.

Note.—The authorities on the question of the relation of the doctrine res ipsa loquitur to burden of proof are reviewed in a note in 16 L.R.A.(N.S.) 527.

Action in the district court for Hennepin county to recover $1,000 for damage to plaintiff's property while a tenant of defendant. The answer admitted the allegations concerning the lease and denied the other allegations. The case was tried before Steele, J., who, at the close of plaintiff's case, denied defendant's motion to dismiss the action and, at the close of the testimony, a motion to direct a verdict in favor of defendant. The jury returned a verdict for $580.79 in favor of plaintiff. From an order denying defendant's motion for judgment notwithstanding the verdict or for a new trial, he appealed. Reversed and new trial granted.

*Edward H. Crooker,* for appellant.

*McDonald, Bernhagen & Patterson* and *A. S. Dowdall, Jr.,* for respondent.

BUNN, J.

This action is to recover damages to property of plaintiff, a tenant of defendant, caused by her premises being flooded with water which is claimed to have come from water pipes exclusively under the control of defendant, and through his negligence. Plaintiff had a verdict and defendant appealed from an order denying his motion in the alternative for judgment notwithstanding the verdict or for a new trial.

That plaintiff, without fault of her own, sustained damages from water flooding her millinery stock, there can be no doubt. Does the evidence sustain the verdict that defendant, her landlord, was to blame? This is the ultimate question before us, and its solution depends largely on the facts disclosed by the evidence.

In the early summer of 1911, defendant erected a two story and basement building on Central avenue in Minneapolis. He employed a competent architect, and the work was done under a general contract by a competent contractor according to plans and specifications furnished by the architect. The building consisted of five stores on the ground floor, with a flat or apartment over each. The stores were known as Nos. 7, 9, 11, 13, and 15 Central avenue. June 11, defendant leased to plaintiff store number 11, under a written lease which provided that the landlord was without obligation to make re-

pairs. Plaintiff took possession of the store with a stock of millinery, and conducted therein her millinery business.

On the morning of September 11, 1911, when plaintiff's daughter opened the store for the day, she found it "raining" in front of her. Water was dripping from the ceiling and the millinery stock had been saturated. Most of this water came from the vicinity of a gas and electric light fixture located in the middle of the ceiling and toward the rear of the store, but quite a large portion of the ceiling was wet. There was no direct evidence showing where this water came from. Plaintiff claimed and endeavored to show by circumstantial evidence that it came from some leak in the water pipes that were in the partition wall between store number 11 and store number 9. It is quite clear that it was necessary for plaintiff to show this in order to have any basis for a charge of negligence on the part of defendant, and the first inquiry is whether sufficient evidence was produced to warrant the jury in concluding that the water came from such a leak.

Two water pipes run in the partition wall between the two stores. They are entirely concealed from view, and there is no outlet in the store. They run up straight until they reach a girder in the partition wall, bend toward store number 9 to get to the top of the girder, then bend to get to the center of the partition again, and then go up straight until they are a foot above the floor of the second story, where there is a joint on each pipe, one pipe turning into the bathroom of the flat over the store occupied by plaintiff, and the other into the bathroom over store number 9. These pipes supply water to the flats, which were occupied by tenants at the time of the flooding, and at the time a month before when defendant's attention was called to discolorations on the ceiling of plaintiff's store, as hereinafter mentioned. The joists run parallel with the front of the building, consist of timbers 12 inches wide and 2 inches thick, and rest on the girder before mentioned. Lathing and plastering on the under side of the joists forms the ceiling, while the floor of the second story is laid on the upper side of the joists. It thus appears that there is a distance of two feet between where the water pipes turn to enter the bath rooms and the ceiling of the store. If there was a leak in either pipe that caused the flooding, it must have been somewhere in this

two feet of pipe, and it must have been either a leak in the joints where the pipes turn to go to the bathrooms, or a break in the pipes below. There were no joints or couplings other than as stated.

There is an absolute lack of evidence of any leak other than the bare fact that water came in large quantities through the ceiling of the store occupied by plaintiff. There is evidence that the partition wall was wet in the vicinity of the pipes, but it was also moist in other places, and there was so much water everywhere that this evidence was valueless as indicating the source of the stream.

After the discovery of the deluge, the plumber who had installed the plumbing originally, at plaintiff's request, cut a hole either in the ceiling or in the wall of store number 9 near where the pipes ran. He testified that he was able to reach the pipes and the joints and that there was no leak. Plaintiff seeks to draw the inference that this plumber found a leak and repaired it while reaching in the hole.

Plaintiff's daughter testified that the plumber put his hands in the hole he had dug, and that he had some kind of instrument, but that she did not know whether this was to open up the wall, or what it was, though she imagined it was to "take the plaster," open the hole.

The plumber testified that the tools he had were a hammer, saw and screw-driver, all of which he used to make the hole to get at the pipes. He denied positively that he repaired any leak, or that he could have done so. The inference sought to be drawn is pure conjecture. Indeed it would seem quite impossible that the plumber could have turned either the pipes or the couplings, or have stopped any leak in the pipes, when he was reaching into the hole. The couplings were on elbows where the pipes turned to enter the flats, and we are unable to see how either pipes or couplings could have been turned so as to stop a leak under the conditions as they existed. It is quite conclusive that there was no leak after the plumber finished his exploration, as other witnesses who examined the pipes through the hole, and also through another hole subsequently made in the floor of the bathroom above, were unable to discover any leak.

It appears that the dripping of water from the ceiling gradually lessened and finally stopped. It is argued that this was because the water was shut off from the pipes in the basement. A witness who

was present soon after the store was opened testified that he turned the water off, or thought he did, but the plumber who came later turned it on again, and it does not appear to have been turned off thereafter. There is no evidence that there was any further flooding after this occasion. We are unable to infer from these facts that the water came from these pipes. The fact that there was a heavy fall of water from the ceiling during the night or early morning, and the fact that it gradually ceased, are more consistent with a suggestion that the water came from the flats above, through the occupants accidentally or negligently permitting it to escape. This suggestion is met with the evidence that the floors of the flats, including the bathroom floors, were dry. But it may be noted that it would not be impossible for the tenants above to remove the evidences of water escaping in their flats, and no one of the occupants of these flats was called as a witness.

It is also difficult to see how water escaping in the partition from a leak in the couplings or in the pipes below could spread over such an area of the ceiling. If it came from the couplings, it would naturally fall on the girder below, and be apt to follow the pipes to the basement. If it was a stream of sufficient volume and force, it might escape into the space between two joists, and perhaps run along here, but it is not easily understood how it could spread over the greater part of the ceiling in sufficient quantities to come through in streams, and it is particularly unexplainable why some of the water did not escape over the ceiling of store number 9. This would have been the more natural course, as the pipes turn towards this store in going around the girder.

Plaintiff's case is largely based upon the proposition that water did fall from the ceiling, that the only water pipes from which it could have come were the pipes in question, and that the floors of the flats above were dry. In other words, plaintiff claims to have proved defendant's responsibility by a process of exclusion of other causes. We regard the proof, even on this theory, insufficient, and, considering the evidence as a whole, it seems pure speculation to say that the water that damaged plaintiff's goods came from the pipes in question.

It is claimed that the rule of res ipsa loquitur applies. The trial court did not think so, and we are of the same opinion. Before this rule could be applied, it would have to be shown that the water came from pipes or fixtures that were under the control of the landlord. The cases cited by plaintiff are cases where water from the faucets of an upper tenant overflows and damages the goods of the tenant beneath. Simon-Reigel v. Gordon-Burnham, 20 Misc. Rep. 598, 46 N. Y. Supp. 416; Killion v. Power, 51 Pa. St. 429, 91 Am. Dec. 127; 1 Tiffany, Landlord & Tenant, 624. In the case at bar, it was necessary for plaintiff to show by a fair preponderance of the evidence that the water came from pipes under the control of the landlord, and also that he was guilty of negligence in relation thereto. Defendant was not an insurer.

Our conclusion is that the evidence is altogether too unsatisfactory to justify the verdict that was rendered. We have considered the evidence very carefully, and find nothing to indicate where the water that damaged plaintiff's goods came from. The evidence practically comes down to the bare facts that water came from somewhere, and that there were water pipes in the partition wall. The trial court said that the case was close, but in our opinion it was so weak that it was the duty of the court to set aside the verdict, conceding that it was not error to refuse a direction.

Of course it was necessary for plaintiff to prove that defendant had knowledge of leaks in the pipes, in addition to proving that the damages to plaintiff were caused by such leaks. Plaintiff attempted to prove such knowledge by evidence that about a month before his attention had been called by plaintiff to discolorations on her ceiling, apparently caused by water. This was admitted by defendant, and he claimed that he investigated the spots and concluded that they came from the refrigerator pan or the bathroom of the tenant above. The plumber whom he called to investigate came to the same conclusion, and decided that the plumbing was all right. The case is very weak here also. It would be difficult to hold, on this evidence, that defendant was bound to insist that the plumber open the partition walls and adjacent ceiling for the purpose of discovering leaks that he was satisfied did not exist.

Our conclusion on the whole case is that the verdict so lacks support in the evidence that it ought not to stand. Plaintiff has suffered a loss for which she is in no way to blame herself, but we are not satisfied that defendant should bear the loss, as the evidence fails to show that he was at fault. It is not, we think, a case for final judgment.

Order reversed and new trial granted.